IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dartez Wells,                              :
                                           :        Case No. 1:19-cv-786
        Plaintiff,                         :
                                           :        Judge Susan J. Dlott
            v.                             :
                                           :        **Order Granting in Part and Denying**
Nisbet, Inc.,                              :        **in Part Motion for Summary**
                                           :        **Judgment and Denying Motion for**
        Defendant.                         :        **Additional Discovery**


        This matter is before the Court on Defendant's Motion for Summary Judgment,

Plaintiff's Memorandum in Opposition, and Defendant's Reply.  (Docs. 16, 22, 24.)  Plaintiff

also filed a Motion for Additional Discovery,[1] to which Defendant filed a Response and Plaintiff

filed a Reply.  (Docs. 23, 25, 26.)  For the reasons that follow, Defendant's Motion for Summary

Judgment (Doc. 16) will be **GRANTED IN PART and DENIED IN PART** and Plaintiff's

Motion for Additional Discovery (Doc. 23) will be **DENIED**.

I.      **BACKGROUND**

        A.      **Facts**[2]

        Defendant Nisbet, Inc. ("Nisbet") manufactures roof and floor trusses, as well as

prefabricated wall panels, for newly constructed homes.  (Haight Dep., Doc. 21 at PageID 303.)

Plaintiff Dartez Wells, an African American, began working at Nisbet through an employment

agency, and he was later hired as a panel fabricator in Nisbet's components department on

February 1, 2016.  (Doc. 16-1 at PageID 276; Doc. 22-1 at PageID 551.)  Prior to hiring Wells,

Caprice Haight, Nisbet's director of human resources, conducted a criminal background check

---

[1] Plaintiff's Motion for Additional Discovery was filed contemporaneously with his Memorandum in Opposition.

[2] Except as otherwise noted, the facts are derived from Nisbet's Proposed Undisputed Facts and Wells's Response.
(Docs. 16-1, 22-1.)

and learned that Wells had four felony convictions, including convictions for robbery, drug abuse, trafficking cocaine, and trafficking heroin, as well as five misdemeanors. (Doc. 16-1 at PageID 275; Doc. 22-1 at PageID 551; Haight Dep., Doc. 21 at PageID 305–06.) Haight shared this information with Daryl Matlock, Wells's supervisor, and Rodney Bays, Nisbet's director of manufacturing, and the decision was made to hire Wells. (Haight Dep., Doc. 21 at PageID 305–08.)

After Nisbet hired Wells, Wells suffered an off-duty injury. Specifically, in the early morning hours of July 16, 2017, Wells and his girlfriend were returning to his mother's house after a night out. (Wells Dep., Doc. 14-1 at PageID 96–97.) While driving, Wells saw Jonathan Lowe, a childhood friend, walking down the sidewalk. (Doc. 16-1 at PageID 277; Doc. 22-1 at PageID 552; Wells Dep., Doc. 14-1 at PageID 105.) Lowe flagged Wells down, and Wells parked the car and got out to speak to him. (Wells Dep., Doc. 14-1 at PageID 99–100.) After Wells exited the vehicle, his girlfriend moved into the driver's seat because she was concerned with Wells's level of intoxication. (Doc. 16-1 at PageID 277; Doc. 22-1 at PageID 552.) Wells and Lowe spoke for approximately five to ten minutes when an individual suddenly approached them and fired several shots in their direction, five of which struck Wells. (Doc. 16-1 at PageID 277–78; Doc. 22-1 at PageID 552–53.) Wells was transported to University Hospital for treatment. (Doc. 16-1 at PageID 278; Doc. 22-1 at PageID 553.) Wells suffered several injuries as a result of the shooting, including hepatic injury, diaphragm injury, colon perforation, right maxillary fracture, left rib fracture, left traumatic pneumothorax, and contusion of left lung. (Doc. 22-3 at PageID 564.)

According to Haight, Nisbet first learned of Wells's injuries on July 17, 2017, at which time Nisbet did not know the details of the incident and only knew Wells was in the hospital

awaiting surgery. (Haight Decl., Doc. 15-1 at PageID 240.) While Wells was in the hospital, Nisbet provided him with Family and Medical Leave Act ("FMLA") paperwork. (Doc. 16-1 at PageID 278; Doc. 22-1 at PageID 553.) Haight testified that Nisbet provided Wells twelve weeks of FMLA leave from July 7, 2017 to October 8, 2017. (Haight Decl., Doc. 15-1 at PageID 241.) Wells disputes this alleged fact and claims he requested six weeks of FMLA leave from July 16, 2017 to August 28, 2017. (Doc. 16-1 at PageID 278; Doc. 22-1 at PageID 553; Doc. 21-11 at PageID 422.) Wells's physician indicated that from August 28, 2017 to October 28, 2017, Wells could have returned to work on a part-time schedule of two days per week and three hours per day. (Doc. 21-11.)

Wells testified that on or around August 28, 2017, he contacted Nisbet regarding returning to work on a part-time basis and performing light-duty work, and he was informed that no such work was available. (Wells Dep., Doc. 14-1 at PageID 109–14, 151.) Haight testified that Nisbet did not have a written light-duty work policy, but the unwritten policy is that light-duty work is only available to employees who are injured on the job. (Haight Dep., Doc. 21 at PageID 315.) According to Wells, however, Nisbet had light-duty work available at the time he requested to return to work. (Wells Dep., Doc. 14-1 at PageID 112–13.)

On September 12, 2017, Haight and Matlock met with Wells to stress the need for him to cooperate with the police to apprehend the shooter. (Haight Decl., Doc. 15-1 at PageID 241; Wells Dep., Doc. 14-1 at PageID 152–53.) According to Wells, however, the police never contacted or questioned him regarding the shooting. (Wells Dep., Doc. 14-1 at PageID 106.) During the meeting, Wells requested to return to work, but Haight explained her and Nisbet's serious safety concerns surrounding Wells returning to work given that the shooter had yet to be apprehended. (Doc. 15-3.) More specifically, Haight informed Wells that if he were to return to

3

work before the shooter was apprehended, Nisbet was concerned the shooter could show up to the workplace to "finish what he started" with Wells and endanger other employees. (*Id*.)

Ultimately, Wells's employment with Nisbet was terminated on October 31, 2017. (Doc. 16-1 at PageID 280; Doc. 22-1 at PageID 555.) Haight testified that Wells was terminated because of the troubling circumstances of the shooting, Wells's failure to cooperate with the investigation of the shooter, and a concern for the safety of other employees if Wells returned to work with the shooting unresolved.[3] (Haight Decl., Doc. 15-1 at PageID 243; Wells Dep., Doc. 14-1 at PageID 114.) An individual believed to be the shooter was apprehended in February 2018 (Haight Dep., Doc. 21 at PageID 336; Doc. 21-23), but the case against the suspect was eventually dismissed (Doc. 15-5).[4]

### B. Procedural Posture

Wells filed this lawsuit against Nisbet on September 14, 2019. (Doc. 1.) In his Complaint, Wells alleges: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964 and Ohio Revised Code §§ 4112.02 and 4112.99; (2) disability discrimination in violation of the Americans with Disabilities Act ("ADA") and Ohio Revised Code §§ 4112.02 and 4112.99; (3) wage discrimination in violation of Ohio Revised Code §§ 4112.02 and 4111.17; (4) violation of his rights under the FMLA; and (5) intentional infliction of emotional distress. (*Id*.) Wells seeks compensatory damages, punitive damages, costs, prejudgment and post judgment interest, and any other relief the Court deems just and equitable.

On October 18, 2021, Nisbet filed the instant Motion for Summary Judgment. (Doc. 16.) Wells filed a Memorandum in Opposition as well as a Motion for Additional Discovery. (Docs.

---

[3] Haight also offered a second reason for Wells's termination: there was no position available for him in October 2017. (Haight Decl., Doc. 15-1 at PageID 243; Wells Dep., Doc. 14-1 at PageID 114.)

[4] The individual charged with the shooting was Lowe's stepson. (Doc. 16-1 at PageID 280; Doc. 22-1 at PageID 554.) According to Wells, the stepson was trying to kill Lowe because he believed Lowe killed his mother. (Wells Dep., Doc. 14-1 at PageID 96–97.)

22, 23.) In the Motion for Additional Discovery, Wells requests the Court to require Nisbet to produce payroll records responsive to his Request for Production of Documents so he can prove his claim for wage discrimination and defend against summary judgment. (Doc. 23.) The Court held oral argument on the pending motions on March 30, 2022. These matters are now fully briefed and ripe for this Court's review.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *see also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists

when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

### A.    Motion for Additional Discovery Pursuant to Rule 56(d)

Pursuant to Federal Rule of Civil Procedure 56(d), Wells requests the Court require Nisbet to produce the payroll documents concerning all employees who worked in Wells's department and postpone consideration of Nisbet's Motion for Summary Judgment until said records have been produced. Wells, as the nonmovant, "bears the obligation to inform the district court of the need for discovery." *Vance By and Through Hammons v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996). In considering a party's Rule 56(d) request, a court considers a number of factors, including "(1) when the [plaintiff] learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would . . . change[] the ruling [on the motion for summary judgment;] (3) how long the discovery period . . . lasted; (4) whether the [plaintiff] was dilatory in [his or her] discovery efforts; and (5) whether the [defendant] was responsive to discovery requests." *Plott v. General Motors Corp., Packard Elec. Div.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995) (cleaned up). The most important factor, and thus the main inquiry for a court, is whether the plaintiff was dilatory in its discovery practices. *Doe v. City of*

*Memphis*, 928 F.3d 481, 491 (6th Cir. 2019).  The district court's allowance of additional discovery is discretionary.  *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009).

This case has been pending with the Court for almost two and a half years.  The parties initially agreed to a discovery deadline of November 6, 2020, but after several extensions the discovery deadline was ultimately set for September 17, 2021.  (Doc. 6; July 30, 2021 Notation Order.)  Wells served his first set of discovery requests, which contained a document production request for the records at issue, on March 16, 2021.  (Doc. 23 at PageID 620; Doc. 23-2.)  Nisbet served its responses and objections thereto on April 23, 2021, and stated it would not be producing the payroll documents.  (Doc. 23 at PageID 620; Doc. 23-4; Doc. 23-5.)  Wells's counsel had a five-month period of time within which she could have attempted to work with Nisbet's counsel to obtain the documents, but instead filed the instant Motion three and a half months after the close of discovery.[5]  To reopen discovery after Wells's dilatory efforts in using the allocated discovery schedule previously set would be inequitable.  Accordingly, Wells's Motion for Additional Discovery is denied.

**B.  Summary Judgment**

**1.  Race Discrimination**

Wells alleges Nisbet discriminated against him because of his race in violation of Title VII and Ohio law.  A claim of race discrimination under Ohio law is evaluated using the same analytical framework as a Title VII race discrimination claim.  *Allen v. Ohio Dept. of Job and Family Servs.*, 697 F. Supp. 2d 854, 880 (S.D. Ohio 2010).  The Court will thus consider Wells's federal and state-law discrimination claims under the Title VII framework.

---

[5] Wells's counsel contacted Nisbet's counsel on November 23, 2021 to inquire about the payroll records.  (Doc. 23-16.)  In response, Nisbet's counsel reiterated its prior objections and Wells's counsel did not respond.

Absent direct evidence of race discrimination,[6] a court analyzes Title VII race discrimination claims under the three-step *McDonnell Douglas* burden-shifting framework. *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001). First, to establish a prima facie case of race discrimination a plaintiff must show that he "(1) is a member of a protected class; (2) was qualified for the position and performed it satisfactorily; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated, non-protected employees, or was replaced by a person outside the protected class." *Jenkins v. Regents of Univ. of Mich. Health Sys.*, 763 F. App'x 545, 550 (6th Cir. 2019) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)). If the plaintiff makes a prima facie showing of discrimination, "the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Id*. If the employer satisfies its burden, the burden then shifts back to the plaintiff to show the nondiscriminatory explanation is merely a pretext for intentional discrimination. *Id*. at 550–51.

It is undisputed that Wells, an African American, is a member of a protected class, he was qualified for his position, and suffered an adverse employment action. However, Nisbet maintains Wells failed to establish a prima facie case of race discrimination because (1) Wells was not replaced by anyone outside the protected class and (2) Wells was not treated differently than a similarly-situated employee in an unprotected class.

Haight testified that Nisbet did not fill Wells's position with another employee, and Wells does not contest her testimony. (Haight Decl., Doc. 15-1 at PageID 242.) Instead, Wells argues Nisbet treated similarly-situated white employees better. In determining whether an employee is similarly situated, the Sixth Circuit has instructed that the comparators "must be similar to [the plaintiff] in all relevant aspects." *Hughes v. General Motors Corp.*, 212 F. App'x 497, 503 (6th

---

[6] Wells has not alleged any direct evidence in support of his race discrimination claim.

Cir. 2007). The individuals with whom the plaintiff seeks comparison "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*. (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

The Court finds that Wells has failed to demonstrate he was treated differently than a similarly-situated employee in an unprotected class. Wells argues that Cassimier Brian, a white male, is a similarly-situated employee whom Nisbet treated more favorably. Wells and Brian had the same job title, reported to the same supervisors, and had prior criminal records when they were hired. (Doc. 21 at PageID 319; Doc. 21-7 at PageID 392.) While employed at Nisbet in 2017, Brian was arrested following a domestic dispute and spent approximately thirty-seven days in jail. (Haight Decl., Doc. 15-1 at PageID 242; Haight Dep., Doc. 21 at PageID 338.) Wells claims Brian was treated more favorably because he was able to return to work after he was released from jail (Haight Decl., Doc. 15-1 at PageID 242), while Wells was not allowed to return to work after the shooting incident.

The Court is not persuaded by Wells's argument. First, although Wells and Brian both had criminal records, their records were not of a comparable nature. Brian's criminal record consisted of two counts of gross sexual imposition in the fourth degree (Haight Dep., Doc. 21 at PageID 319), whereas Wells's criminal record included four felony convictions involving drugs and a robbery. Further, the circumstances of each incident were of a distinguishable nature— Brian was involved in a domestic dispute, whereas Wells was involved in a late-night shooting. Moreover, at the time Wells sought to return to work the shooter had yet to be apprehended and the shooter's motivation for the attack remained unknown. In contrast, according to Haight,

9

Brian was permitted to return to work because she understood the domestic dispute matter had been adjudicated to conclusion and thus did not believe the incident posed a threat to Nisbet's other employees if Brian returned to work. (Haight Decl., Doc. 15-1 at PageID 242.)

Wells also avers that Nisbet treated Michael Kerr, another white male, more favorably. Haight testified that Nisbet does not have a written light-duty work policy, but the unwritten practice is to provide light-duty work for employees who are injured on the job. (Haight Dep., Doc. 21 at PageID 315.) Kerr was treated for prostate cancer and upon his return to Nisbet, he was provided light-duty work despite not suffering a work-related injury.[7] (*Id.* at PageID 316.) As with Brian, however, the circumstances surrounding the shooting are sufficient to remove Kerr from the realm of a sufficiently similar comparator.

As the Court finds that Wells failed to establish he was similarly situated in all respects as to Brian and Kerr, Wells has not presented a prima facie case. Accordingly, Nisbet is entitled to summary judgment on Wells's race discrimination claims.[8]

### 2. Disability Discrimination

Next, Wells's Complaint alleges disability discrimination based on Nisbet failing to provide a reasonable accommodation and terminating his employment. As with race discrimination claims, the Sixth Circuit has explained that "Ohio's disability-discrimination statute and the ADA employ the same analysis." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007); *see also Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569,

---

[7] Wells also identifies two other white employees who he alleges were given light-duty work. Haight testified that these employees were given light-duty work because they suffered work-related injuries. (Haight Dep., Doc. 21 at PageID 318–19.)

[8] Wells contends one of his African-American co-workers gained access to Nisbet's payroll records and informed him that "everybody got paid more than -- than the blacks." (Wells Dep., Doc. 14-1 at PageID 87.) This statement is not supported by any admissible evidence in the record, and therefore does not warrant this Court's consideration. Further, Wells presented no evidence from which the Court could determine whether Wells was similarly situated to the other employees.

697 N.E.2d 204, 206–07 (1998) (stating Ohio courts rely on federal interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law). Thus, the Court will analyze Wells's disability discrimination claims under the ADA for purposes of both his federal and state disability discrimination claims. *Brubaker v. Western & Southern Fin. Grp., Inc.*, No. 1:13-cv-866, 2015 WL 4743046, at *3 (S.D. Ohio Aug. 10, 2015).

The ADA, as amended in the Americans with Disabilities Act Amendments Act, provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As relevant here, discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Discrimination claims under the ADA are analyzed using two separate methods depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Here, Wells presents two closely related claims of disability discrimination: failure to accommodate and discriminatory discharge.[9] The former is premised upon direct evidence, while the latter is premised upon indirect evidence. The Court will address the two claims in turn.

---

[9] Although Wells's Memorandum in Opposition does not clearly distinguish between these two claims, it appears to the Court that he is proceeding under both claims.

###### i.  Failure to Accommodate

Wells alleges Nisbet violated the ADA by failing to accommodate him when he sought to return to work in August 2017.  As explained by the Sixth Circuit, "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination . . . [I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination."  *Id.* (quoting *Kleiber*, 485 F.3d at 868).  This Circuit uses a multi-part test to evaluate reasonable accommodation claims:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 869)).

Wells has presented evidence tending to demonstrate he was "disabled," as defined under the ADA, in August 2017 when he sought to return to work, and Nisbet offers no argument to the contrary.  Rather, Nisbet moves for summary judgment on the grounds that Wells was not "otherwise qualified."  "To show that [he] is otherwise qualified for a position—and thus meet [his] *prima facie* burden—an employee must show that [he] can perform the essential functions of a job with or without an accommodation."  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018).  Essential functions of a job are "core job duties," the removal of which "would fundamentally alter the position."  *Id.* (citations omitted).  Determining what functions of a job are essential is a highly fact specific analysis; courts consider as evidence "the amount of time

spent on a particular function; the employer's judgment; 'written job descriptions prepared before advertising or interviewing' for the position; and the consequences of not requiring the employee to perform the particular function." *Id*. (quoting 29 C.F.R. § 1630.2(n)(3)). Relatedly, a plaintiff must propose a reasonable accommodation to succeed. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996), *abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). A proposed accommodation is "not reasonable if it requires eliminating an essential function of the job." *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 258 (6th Cir. 2019) (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)). As the Sixth Circuit explained, "[i]n failure-to-accommodate claims where the employee requests an 'accommodation that *exempts* [him] from an essential function,' 'the essential functions and reasonable accommodation analyses [] run together.'" *Ford Motor Co.*, 782 F.3d at 763 (quoting *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012)) (emphasis in original).

The Court finds that Wells has demonstrated a question of fact as to whether he was otherwise qualified for his position with a reasonable accommodation. The Court's analysis is guided by two separate yet related inquiries: (1) what are the essential functions of Wells's job and (2) whether Nisbet denied Wells a reasonable accommodation.

Nisbet argues that Wells's medical conditions stemming from the shooting rendered him not "otherwise qualified" for his position because they prevented him from performing certain lifting requirements, and these requirements were essential functions of his job. The job description for Wells's position as a panel fabricator indicates employees "must frequently lift and/or move up to 50 pounds and occasionally lift and/or move up to 100 pounds."[10] (Doc. 14-

---

[10] Wells requests the Court strike the portion of Haight's Declaration wherein she states Wells's position required him to frequently lift and or move up to 50 pounds and occasionally life or move up to 100 pounds on the grounds

4.)  And Wells testified that his medical restrictions included avoiding heavy lifting when he was permitted to return to work on a part-time basis beginning on August 28, 2017.  (Wells Dep., Doc. 14-1 at PageID 110–11.)  The job description, however, is the only evidence Nisbet proffers in support of its position that heavy lifting was an essential function of Wells's job.  And as the Sixth Circuit has explained, "[s]uch a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved."  *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988).  Wells disputes that the aforementioned lifting requirements are essential functions of his job.  According to Wells, in performing his work the heaviest objects he lifted were around five or six pounds, and he was never required to lift objects weighing fifty or one-hundred pounds.[11]  (Wells Dep., Doc. 14-1 at PageID 84, 139–40.)  "Although the employer's judgment receives some weight in this analysis, it is not the end-all—*especially* when an employee puts forth competing evidence.  After all, the burden of making out a *prima facie* case is not an onerous one."  *Hostettler*, 895 F.3d at 855 (internal citations omitted).  Given the competing evidence, a question of fact exists as to whether heavy lifting was an essential function of Wells's job.

The record also reflects that Wells requested an accommodation of light-duty work such as sweeping or operating a nail gun.  (Wells Dep., Doc. 14-1 at PageID 110–12.)  Although this proposed accommodation exempts Wells from heavy lifting, given that the Court has found that whether the lifting requirements are an essential function of Wells's job is a question of fact, it cannot be said that Wells's request is unreasonable.

---

that she has no personal knowledge that panel fabricators actually had to perform these types of tasks.  (Haight Dep., Doc. 21 at PageID 304.)  Given that the Court does not rely on this portion of Haight's Declaration, Wells's request is **DENIED** as moot.

[11] Wells did testify that there are some occasions where multiple employees come together to lift heavy objects.  (Wells Dep., Doc. 14-1 at PageID 140.)

Nisbet also argues that it did not violate the ADA because at the time Wells requested light-duty work in August 2017, no such work was available. (Haight Dep., Doc. 21 at PageID 327–28.) It is true that an employer bears no obligation to create a position not then in existence for a disabled employee, and thus, if there is no vacant position for which the employee is qualified at the time of the alleged failure to accommodate, there is no discrimination. *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000); *Kleiber v. Honda of America Mfg., Inc.*, 420 F. Supp. 2d 809, 821 (S.D. Ohio 2006), *aff'd*, 485 F.3d 862 (6th Cir. 2007). According to Wells, however, Nisbet had light-duty work available in August 2017 when he requested to return to work.[12] (Wells Dep., Doc. 14-1 at PageID 112.) Given the conflicting testimony, the Court finds a question of fact exists regarding whether any light-duty work was available in August 2017. Nisbet's Motion for Summary Judgment as to Wells's failure to accommodate claims is denied.

### ii. Discriminatory Discharge

The Court will now address Wells's discriminatory discharge claim based on his termination in October 2017. When a plaintiff attempts to prove a discrimination claim under the ADA through indirect evidence, the *McDonnell Douglas* burden-shifting framework applies. Under that approach, a plaintiff may establish his discriminatory discharge claim by showing

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is

---

[12] When asked for the specifics as to why Nisbet was unable to provide Wells with a light-duty position, Haight testified that the question should be addressed to Wells's supervisor. (Haight Dep., Doc. 21 at PageID 327–28.) Nisbet submitted no further evidence on this point.

pretextual.  Under this scheme, the plaintiff retains the ultimate burden of
persuasion at all times.

*Hedrick v. Western Rsrv. Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (quoting *Monette*, 90 F.3d
at 1186–87).

The Court finds that Wells has failed to establish a prima facie case.  Wells has presented

no evidence indicating that he remained disabled, as defined under the ADA, at the time his

employment was terminated on October 31, 2017.  Further, Wells does not identify any evidence

demonstrating that his position remained open while Nisbet sought other applicants or that he

was replaced by another individual.  Accordingly, Nisbet's Motion is granted as to Wells's

discriminatory discharge claim.

### 3.  Wage Discrimination

Wells alleges Nisbet paid similarly-situated white co-workers higher wages for equal

work.  In responding to Nisbet's Motion, Wells did not address this claim and therefore summary

judgment for Nisbet on this claim is appropriate.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x

368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a

plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a

motion for summary judgment.").[13]

### 4.  FMLA Interference

Next, Wells's Complaint alleges a violation of the FMLA.  "The FMLA entitles

qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination,

when the leave is taken for, inter alia, 'a serious health condition that makes the employee unable

---

[13] Regardless, Wells's claim would be time-barred.  Ohio Revised Code § 4111.17(E) provides that a claim of wage discrimination must be brought within one-year after the last instance of wage discrimination.  Wells received his last paycheck on September 8, 2017 and initiated this action on September 14, 2019.  (Haight Decl., Doc. 15-1 at PageID 241; Doc. 1.)

to perform the functions of the position of such employee.'" *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (quoting 29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1)). The Sixth Circuit recognizes two theories of recovery under the FMLA: (1) the "entitlement" or "interference" theory under 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory under 29 U.S.C. § 2615(a)(2). *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Although Wells's Complaint arguably alleges violations under both theories, his Memorandum in Opposition indicates he is proceeding only under the interference theory, and the Court finds he abandoned any claim of FMLA retaliation by failing to address this theory. *See Gaiser v. Am.'s Floor Source*, No. 2:18-cv-1071, 2020 WL 419753, at *11 (S.D. Ohio Jan. 27, 2020).

Courts analyze FMLA interference claims based on circumstantial evidence using the *McDonnell Douglas* burden-shifting framework. *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 401 (6th Cir. 2019). In alleging an FMLA interference claim, the plaintiff bears the initial burden to prove a prima facie case. *Harrison v. Proctor & Gamble Distrib., LLC*, 290 F. Supp. 3d 723, 741 (S.D. Ohio 2017). To establish a prima facie case of FMLA interference, the plaintiff must demonstrate: "(1) he is an eligible employee; (2) the defendant is an employer; (3) [he] was entitled to leave under the FMLA; (4) [he] gave the employer notice of his intention to take leave; and (5) the employer denied [the plaintiff] FMLA benefits to which he was entitled." *Wysong*, 503 F.3d at 447 (quoting *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003), *superseded on other grounds by* 29 C.F.R. § 825.302(d)) (cleaned up).

Once the plaintiff proves the prima facie case, the burden shifts to the employer to set forth a legitimate nondiscriminatory reason for the adverse employment action. *Harrison*, 290 F. Supp. 3d at 741. Next, the burden shifts back to the plaintiff to demonstrate the proffered reason

is a mere pretext for unlawful conduct by establishing the proffered reason had no basis in fact, did not actually motivate the adverse action, or was insufficient to warrant the adverse action. *Id*.

Wells argues Nisbet interfered with his FMLA rights by not restoring him to his position in August 2017 or October 2017. Under the FMLA, upon returning from FMLA leave an employee has the substantive right to be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1). "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). The interference theory, however, "does not convert the FMLA into a strict-liability statute." *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447 (6th Cir. 2012). This is because "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Nisbet appears to not dispute that Wells can present a prima facie case of FMLA interference.[14]

Nisbet presents no arguments regarding FMLA interference based on failure to restore Wells to his position in August 2017.[15] As such, Nisbet's Motion is denied as to this claim.[16]

---

[14] The Court clarifies that Nisbet's concession as to a prima facie case was in the context of an FMLA retaliation claim, as in initially moving for summary judgment, Nisbet argues it is entitled to summary judgment in its favor on Wells's claim of FMLA retaliation. Nisbet's Motion does not address an FMLA interference claim. As the Court has already stated, Wells's Memorandum in Opposition makes clear he is proceeding only under an interference theory. Nisbet's reply brief does not argue that Wells cannot establish a prima facie case of FMLA interference.

[15] For the first time in its reply brief, Nisbet argues it is entitled to summary judgment on the FMLA interference claim because Wells failed to respond to Nisbet's Second Set of Requests for Admissions and therefore admitted Nisbet did not interfere with his FMLA leave. The Court declines to consider this argument as it was raised for the first time in Nisbet's reply brief. *Books A Million, Inc. v. H & N Enter., Inc.*, 140 F. Supp. 2d 846, 859 (S.D. Ohio 2001) ("It is well settled, however, that a party may not raise an issue for the first time in a reply brief.").

Regarding FMLA interference based on failure to restore Wells to his position in October 2017, Nisbet claims that the stated reason for terminating Wells's employment—safety concerns—is a legitimate nondiscriminatory reason and there is no evidence of pretext.[17]  The proffered reason for an adverse employment action "must be articulated with sufficient clarity and specificity to provide the plaintiff 'a full and fair opportunity to demonstrate pretext.'" *Brown v. Ohio State Univ.*, 616 F. Supp. 2d 740, 750 (S.D. Ohio 2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)).  A defendant's "burden is merely one of production, not persuasion; it involves no credibility assessment."  *Revennaugh v. United States Postal Serv.*, Nos. 2:16-cv-783, 2:17-cv-879, 2019 WL 4674250, at *11 (S.D. Ohio Sept. 25, 2019) (quoting *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 429 (6th Cir. 2007)).  This burden is satisfied if the defendant "simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons."  *Brown*, 616 F. Supp. 2d at 750 (quoting *Bd. of Tr. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978)) (cleaned up).

The Court finds Nisbet articulated a legitimate nondiscriminatory reason for Wells's termination.  Haight testified that Wells was terminated because of the troubling circumstances of the shooting and accompanying safety concerns if Wells was permitted to return to work given that the shooter had not been apprehended.  (Haight Decl., Doc. 15-1 at PageID 243.)  Wells testified that he was told his employment was being terminated because of safety concerns.  (Wells Dep., Doc. 14-1 at PageID 114.)  Nisbet has submitted evidence "which, *if*

---

[16] As discussed *infra*, even assuming Wells was not restored to his position in August 2017 based on Nisbet's proffered safety concerns, a question of facts renders summary judgment on this claim inappropriate.

[17] As previously noted, Haight also testified that Wells's employment was terminated because there was no position available for him in October 2017.  (Haight Decl., Doc. 15-1 at PageID 243; Wells Dep., Doc. 14-1 at PageID 114.)  Wells's position was purportedly no longer available because Nisbet's construction business slowed down during the winter months.  (Haight Dep., Doc. 21 at PageID 334–35.)  Wells failed to address this contention in responding to Nisbet's Motion.  However, the Court need not address this alleged reason for termination because, as explained *infra*, the Court finds a question of fact exists as to whether Nisbet's safety concern justification was merely pretext.

*believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) (emphasis in original); *see also Algie v. N. Ky. Univ.*, 456 F. App'x 514, 518 (Table) (6th Cir. 2012) ("Concern for safety may constitute a legitimate nondiscriminatory basis for termination of an employee.") (citing *Freeman v. United Airlines*, 52 F. App'x 95, 103–04 (10th Cir. 2002)). Nisbet has satisfied its burden under the second *McDonnell Douglas* step.

Wells argues that Nisbet's safety concern is merely pretextual. In the Sixth Circuit, to demonstrate pretext a plaintiff may show that the offered reason for termination (1) had no basis in fact, (2) did not actually motivate the employer's conduct, or (3) was insufficient to explain the employer's conduct. *Raadschelders v. Columbus St. Comm. Coll.*, 377 F. Supp. 3d 844, 858 (S.D. Ohio 2019). "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Wright*, 455 F.3d at 707 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)) (alteration in original).

Here, Wells seeks to demonstrate pretext by way of the first method—no basis in fact— which is essentially an attack on the credibility of Nisbet's proffered reason for termination. This method "consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual." *Seeger v. Cincinnati Bell Tele. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). Nisbet asserts Wells cannot demonstrate pretext because it honestly believed Wells presented

safety concerns to other employees. Under the Sixth Circuit's modified honest belief doctrine, for an employer to avoid a finding that its stated reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright*, 455 F.3d at 708 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998)). An employer's decisional process need not "be optimal," nor must an employer "le[ave] no stone unturned"; rather, in determining whether an employer held an honest belief in the proffered basis for an employee's discharge, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Tillman v. Ohio Bell Tele. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (quoting *Seeger*, 681 F.3d at 285).

Nisbet identifies three bases for its purported honest belief of safety concerns. First, Nisbet was aware of Wells's prior felony convictions for robbery, drug abuse, and drug trafficking. (Doc. 16-1 at PageID 275; Doc. 22-1 at PageID 551.) Second, Nisbet was also concerned about the circumstances surrounding the shooting. Haight testified that "[t]he fact that [Wells] was shot five times at 3:00 in the morning, waved down by someone that he knew in the dark, it just didn't add up to us and we were fearful that the shooter would return to the work place [*sic*] and try to finish what he started." (Haight Dep., Doc. 21 at PageID 327.) And finally, the shooter had not yet been apprehended in October 2017, and Haight testified that when she met with Wells in September 2017, he seemed apathetic to the shooter's capture or prosecution, which led Haight to believe Wells was not cooperating with the police. (*Id*. at PageID 331–32, 336; Doc. 21-23.)

Nonetheless, the Court finds that a question of fact exists as to whether Nisbet held an honest belief, or whether the proffered reason for termination was pretextual. Nisbet retained a

private investigator in an attempt to uncover more information about the shooting given that the police report Nisbet obtained from the police contained limited information.[18] (Haight Dep., Doc. 21 at PageID 323.) The investigator provided Nisbet with an investigation report on February 7, 2018, after Wells's employment was terminated. (*Id*. at PageID 328.) The report stated there was no direct evidence that Wells and Lowe were making a drug transaction when the shooting occurred, but that it remained a "plausible theory." (Doc. 21-14 at PageID 433.) The report also indicated the investigating officer stated he had only briefly spoken to Wells, but had not otherwise interviewed him in detail. (*Id*. at PageID 437.) The investigating officer also stated he believed the shooter was Lowe's stepson, and that Wells was a random victim rather than the target of the shooting. (*Id*.) Although Nisbet obtained the report after Wells had been terminated, Haight testified that Nisbet received verbal updates during the course of the investigation. (Haight Dep., Doc. 21 at PageID 325.) Haight refused to disclose the substance of these updates on the basis of the attorney-client privilege, as the updates were relayed by counsel. (*Id*. at 325–26.) Thus, as there is no record evidence regarding the particularized information Nisbet received from the private investigator prior to terminating Wells's employment, and the investigation report contains some information that arguably belies a justified belief in safety concerns, whether Nisbet's purported safety concern was merely pretextual remains a question of fact to be presented to a jury. Accordingly, Nisbet's Motion for Summary Judgment as to Wells's FMLA interference claim based on failure to restore him to his position in October 2017 is denied.

### 5. Intentional Infliction of Emotional Distress

Nisbet moves for summary judgment on Wells's intentional infliction of emotional distress ("IIED") claim on the basis that there is no evidence of outrageous conduct or mental

---

[18] It is unclear from the record on which date Nisbet retained the private investigator.

anguish.  Wells's Memorandum in Opposition does not contest this argument and, therefore, the Court finds summary judgment is proper based on forfeiture of such claim.  *See Sloan v. Repacorp., Inc.*, 310 F. Supp. 3d 891, 902 (S.D. Ohio 2018) (granting summary judgment for defendant where plaintiff set forth no developed argument in support of his IIED claim) (citing *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 250 (6th Cir. 2009)).[19]

## IV.  CONCLUSION

For the reasons set forth herein, Nisbet's Motion for Summary Judgment (Doc. 16) is **GRANTED as to Wells's race discrimination, ADA discriminatory discharge, wage discrimination, and intentional infliction of emotional distress claims, and DENIED as to Wells's ADA failure to accommodate and FMLA interference claims**.  Further, Wells's Motion for Additional Discovery (Doc. 23) is **DENIED**.

**IT IS SO ORDERED**.

S/Susan J. Dlott_____
Susan J. Dlott
United States District Court

---

[19] Alternatively, summary judgment is appropriate on the merits.  First, Wells points to no conduct that is sufficient to satisfy the high bar of extreme and outrageous conduct.  *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) ("[A]n employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more.").  And second, Wells has presented no evidence indicating he suffered serious mental anguish.  *See Hicks v. Cadle Co.*, 150 N.E.3d 381, 400, 2019-Ohio-5049 (Ct. App. 2019) (stating, in the context of an IIED claim, "[s]ummary judgment is appropriate when the plaintiff presents no testimony from experts or third parties as to the emotional distress suffered and where the plaintiff does not seek medical or psychological treatment for the alleged injuries") (citation omitted).